Jack W. GRIGSBY, Appellant,

v.

DEPARTMENT OF ENERGY, James R. Schlesinger and The United States of America, Appellees.

No. 5–28.

Temporary Emergency Court of Appeals.

Argued Jan. 6, 1978.

Decided May 2, 1978.

On Petition for Rehearing Oct. 5, 1978.

---

H. H. Hillyer, Jr., New Orleans, La., with whom J. Henry Phillips III, Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, La., and W. Michael Adams, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., were on brief, for appellant.

Linda L. Pence, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen. and Dennis G. Linder, Dept. of Justice, Washington, D. C., were on brief, for appellees.

Arthur E. Gowran, Washington, D. C., with whom Robert G. Heiss, Dept. of Energy, Washington, D. C., and Barbara L. Ward, Washington, D. C., with whom Dennis G. Linder and Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., were on brief, for appellees.

David J. Beck, Fulbright & Jaworski, Houston, Tex., with whom Keith A. Jones and Warren Belmar, Fulbright & Jaworski, Washington, D. C., were on brief, as amici curiae for Exxon Corp., Texas Independent Producers & Royalty Owners Ass'n, and Energy Consumers & Producers Ass'n.

Rush Moody, Jr. and C. Michael Buxton, Vinson & Elkins, Washington, D. C., and Stephen H. Bard, White Plains, N. Y., of counsel, Texaco, Inc., were on the brief as amicus curiae for Texaco, Inc.

Allan Abbot Tuttle, Washington, D. C., with whom James R. Patton, Jr., Patton, Boggs & Blow, Washington, D. C., and Harry E. Barsh, Jr., Camp, Carmouche, Palmer, Carwile & Barsh, Washington, D. C., were on the brief as amicus curiae for the State of Louisiana.

Before HOFFMAN, INGRAHAM and GEWIN, Judges.

INGRAHAM, Judge.

The Federal Energy Administration (FEA) instituted this action against Jack W. Grigsby, an independent oil operator, following FEA audits on two of Grigsby's properties. The ensuing Notice of Probable Violation (NOPV) accused Grigsby of charging prices for crude oil produced from these two properties in excess of the limits set by the Emergency Petroleum Allocation Act of 1975 (Act) and its implementing regulations. The NOPV ripened into a remedial order. Grigsby sued in United States District Court for the Western District of Louisiana for review of the FEA action and for injunction. The district court upheld the FEA remedial order, dismissed Grigsby's complaint and ordered him to comply with the FEA remedial order. The alleged violations present us with two issues of first impression under the Act. We affirm the district court on both issues.

Since the initiation of this suit by the FEA, the agency as it was constituted has

been abolished. As of October 1, 1977, pursuant to the Department of Energy Organization Act, 42 U.S.C. §§ 7101, et seq. (Supp. III 1977), and Executive Order 12009, 42 Fed.Reg. 46267 (1977), the FEA and its functions were transferred to the Department of Energy (DOE), of which James R. Schlesinger is Secretary. Pursuant to Rule 43(c), Federal Rules of Appellate Procedure, the DOE and James G. Schlesinger are hereby substituted as appellees for the FEA and Administrator O'Leary.

The two properties upon which Grigsby purportedly violated the Act are both located in the State of Louisiana—one in the North Jennings Field, Acadia Parish, and the other in the West Pontchartrain East Block 41 Field, St. Charles Parish. Because the question of whether Grigsby overcharged his customers in each of the two fields is based upon a different legal issue, we will discuss each field separately.

## THE NORTH JENNINGS PROPERTY

Grigsby operated the Heywood RA SU B located in the North Jennings Field. The unit was created on January 22, 1969, by Order No. 464–F–1 of the Commissioner of Conservation of the State of Louisiana. The Commissioner's order pooled five separately owned tracts and leases within the unit area and designated Lucky Strike Well No. 1 as the unit well. In accordance with state law, the unit order provided that the production from the unit would be allocated among the leases comprising it.

After a period of substantial production, the Lucky Strike Well began to produce excessive salt water, so Grigsby applied to the Louisiana Department of Conservation for permission to drill a substitute well for the same unit. By Order No. 464–F–2, dated July 26, 1974, the Commissioner authorized Grigsby to drill a new well in the unit to be called the Robert Leger Well No. 1. Completed on a different tract of the unit, the new well began production on

October 14, 1974. In the same month, Grigsby terminated crude oil production from the Lucky Strike Well and closed it. From October 14, 1974 until the present, production of crude oil from the Heywood Sand has been obtained by production from the Robert Leger Well.

On June 24, 1976, the Commissioner of Conservation determined that the Robert Leger Well was completed in a stratigraphically higher reservoir, not in communication with the reservoir from which the Lucky Strike Well produced oil. For this reason, the Commissioner issued Order No. 464–K, which redefined the Heywood Sand as being comprised of two separate reservoirs, the Heywood Sand, Reservoir A, and the Upper Heywood "A" Sand, Reservoir A. The order dissolved the Heywood RA SU B, creating in its stead the Upper Heywood "A" RA SU B. Grigsby remained the operator of the Upper Heywood Sand, and the tracts covered by the five mineral leases continued to be pooled. This case arose when Grigsby treating all production from the Robert Leger Well as "new oil" under FEA regulations, charged upper tier prices for the oil produced from the well.

On November 29, 1976, the FEA issued a remedial order to Grigsby for violations of Cost of Living Council Phase IV Petroleum Price Regulations, 6 C.F.R. § 150.353 (1974) and FEA Petroleum Price Regulations, 10 C.F.R. § 212.73 (1977). The FEA had determined that Grigsby had overcharged Cities Service Oil Company and Cities Service Pipeline Company by billing them at "new oil" prices instead of "old oil" prices beginning on October 14, 1974, and continuing until the date of the remedial order. Grigsby was ordered to reduce prices charged for crude oil produced from the North Jennings properties immediately, so that prices conformed to the FEA's interpretation of 10 C.F.R. §§ 212.73 and 212.74 (1977), and to refund past overcharges with interest to Cities Service.[1]

---

1. The court found the overcharges to total $342,742.43. Of this amount, $46,092.81 represents excess severance tax paid to the State of Louisiana by the buyer because of the over-charge on the price of the oil. Grigsby argued below that he should not have to refund this excess amount of tax to the purchasers, but the trial court rejected his argument. Since Grigs-

On December 11, 1976 Grigsby filed an appeal of the remedial order with the FEA's Office of Exceptions and Appeals. The remedial order was essentially upheld, although the amount of some overcharges was reduced.[2]

Grigsby then appealed the FEA action in the United States District Court.[3] The court granted the FEA's motion for summary judgment upholding the FEA orders. The court also entered partial summary judgment in favor of the FEA on its counterclaim, ordering Grigsby to comply with the FEA remedial order as modified by the appeal decision and order.[4] Grigsby has duly perfected this appeal.[5]

Because Grigsby is an operator of crude oil producing properties, he is subject to the Emergency Petroleum Allocation Act of 1975, 15 U.S.C. §§ 751–760h (1977), as well as the DOE regulations promulgated thereunder. These regulations spell out the two-tier crude oil pricing system, a pricing program which we have discussed and upheld on a number of occasions. *See, e. g., Griffin v. United States,* 537 F.2d 1130 (Em.App.1976); *Cities Service Company v. FEA,* 529 F.2d 1016 (Em.App.1975); *Consumers Union v. Sawhill,* 525 F.2d 1068 (Em.App. 1975).

The two-tier pricing system was established in August, 1973, pursuant to the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1977). The implementing regulations were first promulgated by the Cost of Living Council, *see* 6 C.F.R. §§ 150.353 and 150.354 (1975), later adopted by the FEA, and are now enforced by the DOE. They provide that "old oil" not be sold above the lower tier ceiling price, 10 C.F.R. § 212.73 (1977), and that "new oil" not be sold above the upper tier ceiling price, 10 C.F.R. § 212.74 (1977). Because the upper tier ceiling price is based upon the highest posted price on September 30,

---

by does not forward this contention on appeal, we need not explore the rationale behind the trial court's finding.

2. The remedial order had directed Grigsby to refund amounts in excess of the ceiling price for old oil on the Heywood property for the period from October 14, 1974 until December 1, 1976, and to continue to charge old oil prices into the future. The appeal decision of the FEA reversed the remedial order insofar as calculation of lawful prices after September 1, 1976 is concerned. On that date, the FEA amended the term "property." As amended, the regulation reads:

A producer may treat as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided that such reservoir is recognized by the appropriate governmental regulatory authority as a producing formation that is separate and distinct from and not in communication with, any other producing formation.

10 C.F.R. § 212.72 (1977); *see also* Ruling 1977–2, 42 Fed.Reg. 4409 (1977). The FEA was convinced that the reservoir from which Grigsby was currently producing crude oil (Upper Heywood Sand, Reservoir A) was separate and distinct from the reservoir from which Grigsby was producing crude oil prior to October 14, 1974 (Heywood Sand, Reservoir A). Grigsby was accordingly authorized to charge new oil prices after September 1, 1976.

3. Grigsby predicated jurisdiction upon two grounds. First, Grigsby asserted that the action arose under the laws of the United States and exceeded $10,000. 28 U.S.C. § 1331 (Supp. 1977). Among the United States laws implicated were the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1977); the Federal Energy Administration Act, 15 U.S.C. §§ 761–786 (1976); the Emergency Petroleum Allocation Act of 1975, 15 U.S.C. §§ 751–760h (1976); and the Administrative Procedure Act, 5 U.S.C. § 703 (Supp.1977).

Additionally, Grigsby based jurisdiction upon § 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, incorporated by reference into the Emergency Petroleum Allocation Act of 1975, 15 U.S.C. § 754 (1976).

4. The district court did not enter summary judgment on the two remaining issues in the counterclaim at this time. One of these issues concerned the revised remedial order issued on April 22, 1977, with respect to the Pontchartrain property to be discussed later in the opinion. At the time, this revised order was not in the record. Summary judgment was entered affirming this order on November 16, 1977.

The order issue involved civil penalties against Grigsby and will eventually require a full evidentiary hearing.

5. This court has jurisdiction by virtue of 15 U.S.C. § 754(a)(1), which incorporated § 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1977).

1975,[6] and the lower tier ceiling price is based upon the highest posted price on May 15, 1973,[7] the upper-tier price works to the advantage of the seller of crude oil.

Crude oil is treated as "new oil" to the extent that it exceeds the 1972 level of production of the *property* from which it was produced.[8] The threshold inquiry in determining the amount of new oil produced from a premises is therefore whether the premises is a *property* that produced oil in 1972. This question can be answered only through applying the definition of the term "property." The regulations define "property" as "the right which arises from a lease or from a fee interest to produce domestic crude oil." 10 C.F.R. § 212.72 (1976). Two interpretations of this definition by the FEA are relevant to the present suit.[9]

Ruling 1975–15 was the first FEA attempt to clarify the definition of the term "property." The ruling emphasized the "right to produce" language in the definition, then addressed the application of the definition to unitized properties. The rul-

ing explained that "since the unit agreement signifies one right to produce crude oil arising from several leases . . . the unit defines the property." 40 Fed.Reg. 40832 (1975).

The next FEA attempt to interpret the definition of "property" occurred in 1977 with Ruling 1977–1, 42 Fed.Reg. 3628 (1977). In this ruling, the FEA recognized that the term "property" connoted the "surface acreage" or "tract" to which a producer obtained production rights through an oil and gas lease. *Id.* at 3631. The ruling then focused upon the relationship of the oil and gas lease to property:

> Inasmuch as the lease is the basic document of the oil and gas industry, there should have been no doubt but that CLC [Cost of Living Council] intended by its definition of property to signify the premises described by an oil and gas lease
>
> . . . .

*Id.* at 3632.

By purportedly applying these rulings, along with the definition of property, the

---

**6.** 10 C.F.R. § 212.74(b) (1977). This section provides that:

> (b) *Upper tier ceiling price determination.* The upper tier ceiling price for a particular grade of domestic crude oil in a particular field is (1) the highest posted price on September 30, 1975, for transactions in that grade of crude oil in that field in September 1975, or if there was no posted price in that field for that grade of domestic crude oil, the related price for that grade of domestic crude oil which is most similar in kind and quality in the nearest field for which prices were posted; less (2) $1.32 per barrel.

**7.** 10 C.F.R. § 212.73(b) (1977). This section provides:

> (b) *Lower tier ceiling price determination other than in Alaska and California.* The lower tier ceiling price for a particular grade of domestic crude oil in a particular field other than in Alaska or California is the sum of: (1) The highest posted price at 6 a. m., local time, May 15, 1973, for transactions in that grade of crude oil in that field, or if there was no posted price in that field for that grade of domestic crude oil, the related price for that grade of domestic crude oil which is most similar in kind and quality in the nearest field for which prices were posted; plus (2) $1.35 per barrel.

**8.** This proposition can be deduced only after a journey through the intricate labyrinth known as the DOE regulations. The regulations define "new crude oil" prior to February 1, 1976 as the domestic crude oil production sold in a specific month, less (A) the base production control level for that month, and less (B) the current cumulative deficiency. 10 C.F.R. § 212.72 (1977). For our purposes, "current cumulative deficiency can be ignored.".

"Based production control level," however, is important to the definition. The regulations define this term in relation to crude oil sold before February 1, 1976 as essentially the number of barrels of domestic crude oil produced and sold from that property in the same month of 1972. By fusing the definition of "new crude oil" and that of "base production control level," it can be seen that new crude oil before February 1, 1976 is basically the number of barrels of oil produced in a month, minus the number of barrels produced on that same property during that same month in 1972.

**9.** Ruling 1977–2, clarifying the definition a third time, was issued after the September 1, 1976 amendment which called for separate reservoirs to be treated as separate properties. *See* note 2, *supra.* Because no question is raised in this appeal concerning the definition of "property" after this date, we need not discuss Ruling 1977–2.

FEA found that the production of the Robert Leger Well from the Upper Heywood Sand, Reservoir A, was from the same property as that of the Lucky Strike Well from the Heywood Sand Reservoir. The production from the Robert Leger Well was therefore "old oil" and subject to lower tier prices. It was upon this determination that the FEA concluded, and the trial court agreed, that Grigsby overcharged Cities Service by billing it at upper-tier prices.

On appeal, Grigsby does not dispute the validity of the regulation which defines the term "property," nor does he challenge the two-tier price system. Grigsby instead contests the FEA rulings which have explicated the rudimentary definition of "property" that appears in the regulations.

Grisby argues that in 1974, when he had to decide whether the production from the Robert Leger Well was from the same or from a different property than that from the Lucky Strike Well, he had only the definition set out in the regulations to follow. He contends that he read the definition literally—that "property" was the "right which arises from a *lease* . . . ." 10 C.F.R. § 212.72 (1976) (emphasis added). Since the Robert Leger Well was drilled on a different lease, Grigsby assertedly believed that he was justified in treating production from the lease as being from different property.

Of the two rulings relied upon by the FEA and by the court below, Grigsby directs the brunt of his attack against Ruling 1975–15. He maintains that the ruling is inconsistent with the definition of property and with Ruling 1977–1 to the extent that Ruling 1975–15 held that a unit composed of several leases defines the property. Where unitization exists, according to Grigsby, Ruling 1975–15 expanded the definition of "right to produce," 10 C.F.R. § 212.72 (1976), by extending the breadth of this right from the lease to the multi-lease unit. See 40 Fed.Reg. 40832 (1975).

The standard for review of administrative action, being one which this court has repeatedly discussed, need not be elaborated upon here. The foundation of the standard is § 211(d)(1) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp. 1977), which by virtue of § 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a)(1), governs our review of the FEA's action. The Act provides that no regulation be set aside unless the "issuance of such regulation was in excess of the agency's authority, was arbitrary or capricious, or was otherwise unlawful . . . ." *Texaco, Inc. v. FEA,* 531 F.2d 1071, 1076 (Em.App.1976); *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1400–01 (Em.App. 1975). The arbitrary or capricious standard requires us to uphold the issuance of a regulation if upon consideration of relevant factors, there was no clear error of judgment and there is a rational basis for the conclusions approved by the administrative body. *Texaco, Inc. v. FEA, supra,* at 1076–77. See *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). The burden of persuasion lies on the party contesting the validity of the regulation. *Pasco, Inc. v. FEA, supra,* at 1401; *Condor Operating Co. v. Sawhill,* 514 F.2d 351, 359 (Em.App.), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975).

In the present case, no regulation is challenged. Instead, Grigsby contests an FEA ruling, which in effect is an interpretation by the FEA of its own regulation. The Supreme Court has articulated the following standard for review of an agency interpretation of its own regulation:

When the construction of an administrative regulation rather than a statute is is issue, deference is even more clearly in order. "Since this involves an interpretation of an administrative regulation, a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt. . . . [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."

*Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See, e. g., University of Southern California v. Cost of Living Council,* 472 F.2d 1065, 1069 (Em. App.1972).

We now proceed to apply this standard to determine the validity of Ruling 1975–15. At the outset, we must concede that the regulation defining "property" which this ruling seeks to interpret, suffers from a severe case of unartful drafting. It is therefore necessary for us to try to divine the intent of the drafters of the regulation. The regulation defines property as "the right which arises from a lease or from a fee interest. . . ." 10 C.F.R. § 212.72 (1976). We do not believe that the reference to "*a* lease or *a* fee interest," *id.* (emphasis added), in the singular necessarily indicates a desire on the part of the drafters to limit the definition of property to the right to produce arising from *one* lease or *one* fee interest. We believe that the drafters were seeking instead to delineate in specific language the type of oil interests which should be encompassed in the definition. This conclusion flows from the fact that the drafters excluded several oil interests such as the royalty interest and the executory interest, while including the fee interest, an interest which is not as common a producing interest as the oil lease, but which deserves to be given the same treatment as the lease.

We therefore believe that the FEA was not arbitrary or capricious, or clearly erroneous when it stated in Ruling 1975–15 that a unit of several leases could define the property. See 40 Fed.Reg. 40832 (1975).

Unitization normally results in the alteration of producing patterns and often distorts actual production from any one lease comprising the unit. It would therefore be impractical, if not impossible, to focus on each lease in a unitized property.

To allow the unit to define the property, on the other hand, is consistent with both the language of the definition and the purposes of the Act. Though the entire unit signifies only one right to produce, each leaseholder still claims a portion of that right through his lease in the unit. Therefore, the requirement of the definition that property be a right to produce which arises from the lease is satisfied. Because the unit defines the property, it makes no difference if the producing well is moved from one lease to the next. Neither the right to produce from the unit nor one leaseholder's portion of that right to produce changes.

Grigsby argues that Ruling 1975–15 conflicts with Ruling 1977–1. According to Grigsby, Ruling 1977–1 counsels that the term "property" should always be equated with the term "lease." We must also reject this argument. A close reading of the ruling reveals that "property" is "*generally* synonymous with the tract or premises as to which a right to produce exists pursuant to an oil and gas lease. . . ." [10] 42 Fed. Reg. 3628, 3632 (1976). We agree that in most instances, the lease defines the property. In those cases where leases are pooled, however, the two terms cannot be equated. Ruling 1977–1 recognizes this fact, by incorporating by reference the discussion of the treatment of unitized leases from Ruling 1975–15. *Id.* at 3634.

---

**10.** Grigsby also cites to another passage which appears in this ruling:

> Inasmuch as the lease is the basic document of the oil and gas industry, there should have been no doubt but that CLC [Cost of Living Council] intended by its definition of property to signify the premises described by an oil and gas lease. . . .

42 Fed.Reg. 3628, 3632 (1977). Grigsby attaches great significance to the tone of absoluteness in the statement—concluding that the statement supports the contention that a lease is always equivalent to the term "property." We believe this reliance to be displaced, however, because of the caveat in the footnote

appending the statement. The footnote reveals that the statement was meant only to apply to the great majority of instances. *Id.* at 3632 n.3. The FEA has indicated its intention not to be tied to a wooden interpretation of the term "property":

> FEA has determined that the clarification of past applications of the property concept should recognize more flexibility because of a variety of circumstances under which an interpretation of the term property that was limited to the literal meaning of the language of the definition would be inequitable.

*Id.* at 3632–33.

In sum, we hold that Ruling 1975–15 is a rational interpretation of the definition of "property" that appears in the DOE regulations, and that the ruling is not inconsistent with Ruling 1977–1, insofar as treatment of unitized properties is concerned. Therefore, the fact that the Robert Leger Well was drilled on a different lease from the Lucky Strike Well does not of itself signal that the Robert Leger Well was drilled on different property.

Grigsby argues in the alternative that the redefinition of the unit by the Commissioner of Conservation from the Heywood RA SU B to the Upper Heywood "A" RA SU B created a new right to produce, thereby rendering the production from the Robert Leger as production from a different property. According to Grigsby, the right to produce flows from the state conservation permits and forced pooling orders covering the two wells. The operator of the Robert Leger well has a right to produce only from the Upper Heywood "A" Sand, Reservoir A. Grigsby contends that this right, derived from the forced pooling order covering that reservoir, is a wholly different right to produce than the right derived from the order creating the Heywood Sand, Reservoir A. The fact that Grigsby is the operator in each instance and that the same leases are included in each unit is coincidental.

Ruling 1975–15 put producers on notice that the definition of the term "property" cannot be construed "to mean that production from separate reservoirs subject to the same working interest would simply by virtue of the fact that the several reservoirs have been developed and produced separately be regarded as production from separate properties." 42 Fed.Reg. 3628, 3634 (1975). At the same time, however, the ruling recognized that in special instances, "it would have been impracticable or inequitable for producers not to have treated separately production from a separate reservoir or reservoirs." _Id._ Neither the FEA statutes or the implementing regulations prescribe treatment for a multi-reservoir right to produce. We can therefore discern no reason which would compel the FEA to treat separate producing reservoirs as per se different rights to produce. The FEA has rationally resolved the problem of separate reservoirs, and we accordingly hold that its interpretation of the term "property" is not clearly erroneous.[11]

The FEA did not apply the ruling in an arbitrary and capricious manner to the separate reservoirs involved in this case. Though there are instances in which two reservoirs such as the Heywood Sand, Reservoir A and the Upper Heywood "A" Sand, Reservoir A, should constitute separate properties, this is not such a case. Order 464–F–1, which created the original Heywood RA SU B Unit, did not limit the unit to a specific reservoir. For the purposes of the Emergency Petroleum Allocation Act, the order therefore created one right to produce which covered all the reservoirs existing beneath the surface of the unit.

11. The FEA explained its decision not to treat separate producing reservoirs as separate properties in the following manner:

[A]ny producer which adopted a reservoir-by-reservoir approach to the definition of property (and, hence, to the computation of amounts of "new" and "released" crude oil) would typically have been in a position to achieve greater benefits under the price regulations over the past three years than those producers who took the approach of aggregating production from all reservoirs subject to the same right to produce, as required under the regulations. At least until February 1, 1976, any producer that treated each reservoir as a separate property automatically would have obtained "new" crude oil whenever production was obtained from a new reservoir. Producers using the lease approach, on the other hand, were required first to exceed 1972 levels of production from the lease concerned before any production from a new reservoir would be regarded as "new" crude oil. FEA has unfortunately not been able to obtain any approximation of the extent to which producers have actually adopted a reservoir-by-reservoir definition of property.

Under these circumstances, FEA has concluded that it would be inequitable to permit producers who took an expansive—and, in FEA's view, unwarranted—view of the meaning of the term property to obtain benefits that were not afforded to producers who adhered closely to the regulations.

Ruling 1977–1, 42 Fed.Reg. 3628, 3634 (1977).

Order 464–K, which redefined the Heywood Sand as being composed of two reservoirs, created a new unit for the upper sand and abolished the old unit which had been producing from the lower sand. Again, regardless of the state law effect of the order, for the purposes of the federal energy laws the order merely partitioned the Heywood Sand into two units, each with its own reservoir, abolished one of the units, and kept the other viable. We do not accept Grigsby's argument that the division of the Heywood Sand created two properties where only one previously existed. The Robert Leger Well produced from the same property as the Lucky Strike Well in spite of the fact that it produced from a different reservoir pursuant to a different state conservation permit order.

In conclusion, we hold that the trial court was correct in deciding that the Robert Leger Well was drilled on the same "property" as the Lucky Strike Well, and that therefore the oil produced from the Robert Leger should have been sold at lower-tier prices.

## WEST PONTCHARTRAIN PROPERTY

Grigsby is also the operator of a crude oil producing property known as the WLPE 41 7600′ SU in the West Pontchartrain East Block 41 Field (Pontchartrain Field). Like the North Jennings property, the dispute from this field arises out of the two-tier pricing system; unlike the North Jennings property, both parties agree that the oil produced in this field is "old oil." The dispute instead concerns how that "old oil" is to be priced.

As we discussed earlier, DOE regulations set the ceiling price for "old oil" as of May 15, 1973. On this date, Grigsby's Pontchartrain property was not named in any price bulletin. Grigsby was selling the production from this property to Shell Oil Company under a written contract executed on June 11, 1971, but amended twice since that date.[12] The current provision provided for a flat price of $3.75 per barrel, to fluctuate with any changes in the arithmetical average of the prices posted for 40° gravity crude oil by producers in four nearby fields.[13] On May 15, 1973, each of the firms operating the four fields had issued price bulletins providing for a posted price of $4 per barrel for 40.0° gravity crude oil, less 2¢ per degree reduction for each full degree of gravity below 40.9°.

Though the price of the oil from the referenced fields fluctuated with the grade of the crude oil produced, Grigsby's contract was drafted in such a manner that Pontchartrain oil was sold at the same price regardless of its grade. That price was the price of the 40° gravity oil from the referenced fields.

During the period covered by the FEA audit, Grigsby charged Shell the price specified in the contract. The oil sold during this period was between 37° and 37.9° gravity. Shell paid $4 per barrel for this oil while oil of the same grade from the nearest field was selling for $3.94 per barrel.

In the same remedial order setting forth the alleged violations on the North Jennings property, the FEA challenged Grigsby for charging $4 per barrel of crude oil sold from the Pontchartrain property. Both Grigsby and the FEA agreed that

12. As originally executed, the contract bound Grigsby to sell the Pontchartrain production to Shell at a price per barrel equal to Shell's posted price for oil of like gravity produced in the Good Hope Field, less transportation costs provided by Shell from the Pontchartrain Field to Shell's facilities. At the time, the posted price was $3.69 per barrel for 37.0°–37.9° crude oil. Shell paid this sum minus 12¢ per barrel for transportation costs, or $3.57 per barrel.

The contract between Grigsby and Shell was amended on two different occasions prior to

May 15, 1973. On July 1, 1972, the parties agreed to a flat price of $3.57 per barrel. According to Shell, the flat price did not represent a price change, but merely eliminated reference to gravity or transportation. The price was finally amended on April 12, 1973 by letter. The terms of this final contractual provision are the same as those discussed in the text above.

13. The referenced prices were those posted by Shell for Good Hope Field, Texaco for Caillou Island Field, Exxon for Avery Island Field, and Gulf for Delta (Ostrica) Field.

there was no posted price in the field and that therefore the related price controlled. The parties disagreed, however, as to how the related price should be determined. Grigsby argued that the related price was the price stated in the contract between Shell and Grigsby.

The FEA rejected this argument and instead found that the related price was the posted price in the nearest field for oil between 37° and 37.9° gravity. Since the nearest field was the Shell Good Hope Field, and oil of this grade was selling in the Shell field for $3.94 per barrel, the FEA found $3.94 per barrel to be Grigsby's base price. The FEA subtracted another 12¢ per barrel from this price because Shell had paid for its own transportation costs,[14] setting Grigsby's lawful price at $3.82 per barrel. Grigsby was accordingly directed to refund overcharges made to Shell Oil Company, Stone Energy Company and Summit Gas Company from August 1, 1975 until January 31, 1976,[15] as well as to reduce the price of oil produced on the Pontchartrain property to a level consistent with the FEA's interpretation of 10 C.F.R. §§ 212.73 and 212.74 (1977).

The March 8, 1977, appeal decision agreed with the remedial order that the applicable price for the Pontchartrain oil was the price for the same grade of oil sold in the Good Hope Field. The appeal decision, however, did not agree that the 12¢ transportation charge should be subtracted from Grigsby's ceiling price.[16] The remedial order was remanded for a recomputation of the overcharges, using a ceiling price of $3.94 per barrel. The revised remedial order, issued on April 22, 1977, provided for restitution of $17,681.25 to the three companies. This revised order was affirmed on partial summary judgment by the trial court on November 16, 1977.

When a price is posted for an oil field, the ceiling price for the oil produced in that field is the sum of the highest posted price for the same grade of crude oil in the same or nearest field on May 15, 1973, plus $1.35. 10 C.F.R. § 212.73 (1977). If there are no posted prices in that field, the related price for that grade of domestic crude oil which is most similar in kind and quality in the nearest field for which prices were posted controls. 10 C.F.R. § 212.73 (1977). The parties agree that no price was posted in the Pontchartrain Field on May 15, 1973, and that therefore the related price controls. Because the related price for oil from the Pontchartrain Field is based upon the posted price of oil in the nearest field, our inquiry focuses upon the determination of this posted price. The concept of "posted price" is one which has been utilized in the crude oil market for some time. The definition of "posted price" promulgated by the Cost of Living Council on November 30, 1973, see 38 Fed.Reg. 33577, 33578 (1973), was later adopted by the FEA without alteration and remains virtually unchanged today:

> "Posted price" means a written statement of crude petroleum prices circulated publicly among sellers and buyers of crude petroleum in a particular field in accordance with historical practices, and generally known by sellers and buyers within the field.

42 Fed.Reg. 3628, 3635 (1977).

The trial court agreed with the FEA that the nearest field for which prices were post-

---

14. The June 11, 1971 contract described in footnote 12, *supra,* provided that Shell would pay Grigsby for the Pontchartrain oil a price equal to Shell's posted price for the Good Hope Field, less transportation costs provided by Shell from the Pontchartrain Field to Shell's facilities. The FEA apparently believed that this provision was still in effect.

15. According to the remedial order, Grigsby had overcharged Shell by $25,322.04, Stone by $14,070 and Summit by $12,154.11.

16. In the appeal decision, the FEA found no basis for the conclusion that the transportation was being provided by Shell on May 15, 1973. Furthermore, there was no provision in the contract in effect on May 15, 1973 for reimbursing transportation charges provided by Shell. The provision to this effect which had existed in the June 11, 1971 contract between the parties had been superseded by the contract on June 11, 1972, which did not provide for reimbursement of transportation costs.

ed was the Good Hope Field. The prices in effect in this field were posted in a bulletin of general circulation on May 15, 1973. The price charged for oil between 37° and 37.9° gravity, the grade of oil produced in the Pontchartrain Field, was $3.94 per barrel. It was upon this price that the trial court relied in ruling that Grigsby had overcharged Shell by 6¢ per barrel.

Grigsby's contention earlier and now on appeal is that the price set by the contract in effect between Shell and Grigsby on May 15, 1973, constitutes the posted price for the Shell Field and, therefore, the related price for the Pontchartrain Field. The Shell price bulletin in effect on May 15, 1973, provided that "subject to the terms and conditions of its division orders and other contracts," Shell would pay the prices specified in the bulletin. Grigsby seizes upon the language "subject to the terms . . of its . . . contracts" to argue that the bulletin adopts the contract price by express reference. According to Grigsby, the contract price serves as the posted price for the Shell Good Hope Field and is therefore the related price for the Pontchartrain Field.

We believe that Grigsby's contention on this issue lacks merit. In FEA Ruling 1977–1, the FEA noted that:

> [O]ther than the published price bulletins of the type traditionally issued by major oil companies, FEA will only recognize as a 'posted price' written offers to purchase only so long as they were bona fide public offers of general applicability to crude oil producers in the field.

42 Fed.Reg. 3628, 3635 (1977). The ruling goes on to state that a written contract will not qualify as a posted price "because it represents an agreement between a buyer and specific producer, not a bona fide offer to purchase from all producers." *Id.* This test easily meets a threshold standard of rationality. It furthers the DOE policy to maintain the general availability of posted prices by permitting both producers and purchasers to determine applicable ceiling prices for a given grade of oil produced from a particular field. Because posted prices are a matter of public record, and thus generally available, they help produce the desired uniformity for purposes of maintaining equitable prices pursuant to § 4(b)(1)(F) of the Emergency Petroleum Allocation Act.

■ The requirement that posted price be *bona fide* offers to all purchasers serve another purpose also. The use of such prices eliminates the inherent inequities of contractual prices which normally involve numerous other bargaining factors. For these reasons, we hold that the contract price cannot serve as the related price for the purposes of the ceiling for Grigsby's Pontchartrain oil. Therefore, the ceiling price for the Pontchartrain oil was the posted price in the Shell Good Hope Field, or $3.94 per barrel. The trial court was correct in finding that Grigsby had overcharged Shell by $17,681.25.

## SUMMARY JUDGMENT AND CONCLUSION

Grigsby finally asserts that summary judgment should not have been entered on behalf of the FEA because genuine issues of material fact exist that must be resolved by a formal evidentiary hearing. It is clear that no genuine issues of fact exist.[17] The issues argued on this appeal are legal, not factual issues, and are dispositive of the outcome of the case. As we recently stated in *Mobil Oil Corp. v. FEA,* 566 F.2d 87, 92 (Em.App.1977), "[t]o preclude summary judgment the disputed facts must be material" and "must affect the outcome of the litigation." There are no material issues left to be resolved in this case.

In conclusion, we hold that the trial court was correct in upholding the FEA action on both properties. Grigsby should have charged old oil prices on the production

---

17. For example, Grigsby argues that he should be allowed to establish that the Robert Leger Well was drilled on a different lease. We, however, do not believe this is a material fact issue for the reasons that we have set out in the text above—that Grigsby's unitized property is one property even if the Robert Leger Well was drilled on a different lease.

from the Robert Leger Well for it was drilled on the same property as the Lucky Strike Well. With respect to his Pontchartrain property, the ceiling price for the oil produced should have been set at the same price as that of the oil posted in the Shell Good Hope Field for oil between 37° and 37.9° gravity, or $3.94 per barrel.

The judgment of the district court is AFFIRMED.

## ON PETITION FOR REHEARING

This case involving compliance with federal oil pricing regulations is before this court on a petition for rehearing filed on May 16, 1978, pursuant to General Rules 1 and 33 of this court and Rule 40 of the Federal Rules of Appellate Procedure. The petition was duly granted on May 22, 1978. On this rehearing, appellant Jack W. Grigsby alleges that our opinion of May 2, 1978, contains material factual errors, which warrant reversal of the district court or, in the alternative, remand to the district court for further proceedings consistent with correction of the factual errors. Specifically, Grigsby argues that our opinion misinterpreted two orders issued by the Louisiana Commissioner of Conservation which affect oil prices in the North Jennings Field. We find some merit in Grigsby's argument. Accordingly, we affirm the judgment of the district court in part and reverse and remand in part. Our opinion of May 2, 1978, is modified as follows: the three paragraph introduction and the section entitled "West Pontchartrain Property" are readopted in toto; the sections entitled "The North Jennings Property" and "Summary Judgment

and Conclusion" are vacated in toto and are replaced by the sections below.*

## THE NORTH JENNINGS PROPERTY

Grigsby operated the Lucky Strike Well No. 1, the unit well for the Heywood Sand, Reservoir A, Sand Unit B [a] (Heywood RA SU B) located in the North Jennings Field. The unit was created and the unit well designated on February 20, 1969, by Order No. 464–F–1 of the Louisiana Commissioner of Conservation.[b] The Commissioner's order pooled five separate leaseholds within the unit area. In accordance with state law, the pooling order provided that the production from the unit would be allocated among the leases comprising the unit on a surface acreage basis.

After a period of substantial production, the Lucky Strike Well No. 1 began to produce excessive salt water. Grigsby thus applied to the Louisiana Department of Conservation for permission to drill a "substitute unit well" for the Heywood RA SU B. By Order No. 464–F–2, dated July 26, 1974, the Commissioner authorized Grigsby to drill a well on a different lease in the unit. The "substitute unit well," the Robert Leger Well No. 1, began production on October 14, 1974. In the same month, Grigsby terminated crude oil production from the Lucky Strike Well No. 1. From October 14, 1974, until the present, Grigsby has treated production of crude oil from the Robert Leger Well No. 1 as "new oil" under FEA regulations, charging upper tier prices.

---

* In order to avoid confusion with the footnote system used in our prior opinion, the footnotes herein will be designated alphabetically.

a. The term "unit" refers to a "drilling unit," a designation by state authorities for "the maximum area which may be efficiently and economically drained by one well." La.Rev.Stat. Ann. § 30:9(B) (1975). "Unitization" refers to the compulsory pooling of interests to form a single drilling unit. Production from unitized premises is allocated to the various interests comprising the unit on a surface acreage basis.

b. Order No. 464 of the Commissioner of Conservation, issued on May 5, 1959, was the first

order to recognize a drilling and production unit in the Heywood Sand, Reservoir A. The Texas Pacific Coal & Oil Company was the operator of the designated unit well. Order No. 464–F–1, issued on February 20, 1969, established two units in place of the one unit established by Order No. 464: the Heywood RA SU A and the Heywood RA SU B. The definitions of these two units and corresponding unit wells were altered by Order No. 464–F–3. All drilling units created by orders of the Commissioner of Conservation consisted of premises on different leaseholds which were force-pooled.

On March 12, 1976, Grigsby gave written notice to the Commissioner of Conservation of his intent to request the issuance of orders recognizing two reservoirs in the North Jennings Field.[c] Pursuant to Grigsby's request and after a hearing, the Commissioner of Conservation issued two orders on June 24, 1976. Order No. 464–F–3 acknowledged the existence of two reservoirs in the North Jennings Field: the Heywood Sand, Reservoir A, and the Upper Heywood "A" Sand, Reservoir A. Order No. 464–K established two drilling and production units which force-pooled the participating lease-hold premises for the Upper Heywood "A" Sand, Reservoir A: the Upper Heywood "A" Sand, Reservoir A, Sand Unit A (Upper Heywood RA SU A), and the Upper Heywood "A" Sand, Reservoir A, Sand Unit B (Upper Heywood RA SU B). The unit well for the Upper Heywood RA SU A, the Robert Leger Well No. 2, was operated by the Texas Pacific Coal & Oil Company. The unit well for the Upper Heywood RA SU B, the Robert Leger Well No. 1, was operated by Grigsby. The Robert Leger Well No. 1 had formerly been the "substitute unit well" for the Heywood RA SU B.[d]

On November 29, 1976, the FEA issued a remedial order to Grigsby for violations of Cost of Living Council Phase IV Petroleum Price Regulations, 6 CFR § 150.353 (1974), and FEA Petroleum Price Regulations, 10 CFR § 212.73 (1977). The FEA determined that Grigsby had overcharged Cities Service Oil Company and Cities Service Pipeline Company by billing them at "new oil" prices instead of "old oil" prices from October 14, 1974, until the date of the remedial order. Grigsby was ordered to reduce prices for crude oil produced from the Robert Leger Well No. 1 immediately, to conform prices to the FEA's interpretation of 10 CFR §§ 212.73, 212.74 (1974), and to refund past overcharges with interest to Cities Service.[e]

On December 11, 1976, Grigsby filed an appeal of the remedial order with the FEA's Office of Exceptions and Appeals. The remedial order was essentially upheld, although the amount of some overcharges was reduced.[f]

Grigsby then appealed the FEA action to the United States District Court.[g] The

c. Grigsby's notice to the Commissioner of Conservation was given within three weeks following his receipt on February 20, 1976, of the Notice of Probable Violation issued by the FEA Region VI.

d. The Robert Leger Well No. 1 is presently the unit well for both the Upper Heywood RA SU B, Order No. 464–K, and the Heywood RA SU B, Order No. 464–F–3. We do not understand why the Robert Leger Well No. 1 was redesignated by the latter order as the unit well for the Heywood RA SU B, if, as the record suggests, this well was a dry hole.

e. The court found that the overcharges totaled $342,742.43. Of this amount, $46,092.81 represents excess severance tax paid to the State of Louisiana by the buyer because of the overcharge on the price of the oil. Grigsby argued below that he should not have to refund this excess amount of tax to the purchasers, but the district court rejected this argument. Since Grigsby does not forward this contention on appeal, we need not explore the rationale behind the district court's finding.

f. The remedial order had directed Grigsby to refund amounts in excess of the ceiling price for "old oil" and to charge "old oil" prices in the future. The appeal decision of the FEA

reversed the remedial order insofar as prices were calculated after September 1, 1976, the effective date of the FEA amendment of the definition of "property." The amendment provides:

A producer may treat as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided that such reservoir is recognized by the appropriate governmental regulatory authority as a producing formation that is separate and distinct from and not in communication with, any other producing formation.

10 CFR § 212.72 (1977); see also Ruling 1977–2, 42 Fed.Reg. 4409 (1977). The FEA was convinced that the reservoir from which the Robert Leger Well No. 1 was currently producing crude oil (Upper Heywood "A" Sand, Reservoir A) was separate and distinct from the reservoir from which Grigsby was producing crude oil prior to October 14, 1974 (Heywood Sand, Reservoir A). Grigsby was accordingly authorized to charge "new oil" prices after September 1, 1976.

g. Grigsby predicated jurisdiction upon two grounds. First, Grigsby asserted that the action arose under the laws of the United States and exceeded $10,000. 28 U.S.C. § 1331 (Supp.

court granted the FEA's motion for summary judgment upholding the FEA orders. The court also entered partial summary judgment in favor of the FEA on its counterclaim, ordering Grigsby to comply with the FEA remedial order as modified by the appeal decision and order.[h]

As an operator of crude oil producing properties, Grigsby is subject to the Emergency Petroleum Allocation Act of 1975, 15 U.S.C. §§ 751–760h (1977), as well as the DOE regulations promulgated thereunder. These regulations spell out the two-tier crude oil pricing system, a pricing program which we have discussed and upheld on a number of occasions. *See, e. g., Griffin v. United States*, 537 F.2d 1130 (Em.App. 1976); *Cities Service Co. v. FEA*, 529 F.2d 1016 (Em.App.1975); *Consumers Union v. Sawhill*, 525 F.2d 1068 (Em.App.1975).

The two-tier pricing system was established in August, 1973, pursuant to the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1977). The implementing regulations were first promulgated by the Cost of Living Council, *see* 6 CFR §§ 150.-353, 150.354 (1974), later adopted by the FEA, and are now enforced by the DOE. They provide that "old oil" may not be sold above the lower tier ceiling price, 10 CFR § 212.73 (1977), and that "new oil" may not be sold above the upper tier ceiling price, 10 CFR § 212.74 (1977). The upper tier ceiling price is based upon the highest posted price on September 30, 1975, and the lower tier ceiling price is based upon the highest posted price on May 15, 1973.[i]

Crude oil is treated as "new oil" to the extent that monthly production exceeds the "base production control level" (BPCL), or production, from the same "property" in the same month in 1972.[j] The threshold inquiry in determining the amount of "new oil" produced from a premises is therefore

---

1977). Among the United States laws implicated were the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1977); the Federal Energy Administration Act, 12 U.S.C. §§ 761–786 (1976); the Emergency Petroleum Allocation Act of 1975, 15 U.S.C. §§ 751–760h (1976); and the Administrative Procedure Act, 5 U.S.C. § 703 (Supp.1977). Additionally, Grigsby based jurisdiction upon § 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1977), incorporated by reference into the Emergency Petroleum Allocation Act of 1975, 15 U.S.C. § 754 (1976). Appellate jurisdiction lies with this court by virtue of these latter two statutes.

**h.** The district court did not enter summary judgment on the two remaining issues and the counterclaim at this time. One of these issues concerned the revised remedial order issued on April 22, 1977, with respect to the Pontchartrain property which was discussed in our opinion of May 2, 1978. At the time, this revised order was not in the record. Summary judgment was entered affirming this order on November 16, 1977. The other issue involved civil penalties against Grigsby and will eventually require a full evidentiary hearing.

**i.** 10 CFR § 212.74(b) (1977) provides:
The upper tier ceiling price for a particular grade of domestic crude oil in a particular field is (1) the highest posted price on September 30, 1975, for transactions in that grade of crude oil in that field in September 1975, or if there was no posted price in that field for that grade of domestic crude oil, the

related price for that grade of domestic crude oil which is most similar in kind and quality in the nearest field for which prices were posted; less (2) $1.32 per barrel.
10 CFR § 212.73(b) (1977) provides:
The lower tier ceiling price for a particular grade of domestic crude oil in a particular field other than in Alaska or California is the sum of: (1) The highest posted price at 6 a. m., local time, May 15, 1973, for transactions in that grade of crude oil in that field, or if there was no posted price in that field for that grade of domestic crude oil, the related price for that grade of domestic crude oil which is most similar in kind and quality in the nearest field for which prices were posted; plus (2) $1.35 per barrel.

**j.** The regulations define "new crude oil" prior to February 1, 1976, as the domestic crude oil production sold in a specific month, less (A) the base production control level for that month, and less (B) the current cumulative deficiency. 10 CFR § 212.72 (1977). The regulations define "base production control level" in relation to crude oil sold before February 1, 1976, as the number of barrels of domestic crude oil produced and sold from that "property" in the same month of 1972. By fusing the definitions of "new crude oil" and "base production control level," "new crude oil" before February 1, 1976, is generally the number of barrels of oil produced in a month minus the number of barrels produced on that same "property" during the same month in 1972.

whether the premises is a "property" that produced oil in 1972.

## A. PRODUCTION FROM THE LEGER LEASEHOLD?

Grigsby argues that, in 1974, when he had to decide whether the production from the Robert Leger Well No. 1 was from the same or a different "property" than that from the Lucky Strike Well No. 1, he had only the definition in the regulations to follow: "Property is the right which arises from a lease or from a fee interest to produce domestic crude oil." 10 CFR § 212.72 (1975). He contends that he read the definition literally—that "property" was the "right which arises from a *lease.*" *Id.* (emphasis added). Since the Robert Leger Well No. 1 was drilled on a different lease from that on which the Lucky Strike Well No. 1 was drilled, Grigsby asserts that the production arose from a different "property."

Grigsby is incorrect in stating that "property" is measured solely by the fee or leasehold interest. The focus of the "property" definition is upon the "right to produce," not the fee or leasehold nature of the ownership interest. If Grigsby were correct in stating that the nature of the ownership interest alone controlled the definition of "property," a mineral lessee could evade the price control and allocation programs by pooling his interest with that of neighboring lessees and gerrymandering the situs of the well among the various leaseholds.[k]

■ The "right to produce" arises from a combination of sources, including, but not limited to, the nature of the ownership interest, contractual extension or restriction of ownership interest, and orders of state regulatory agencies. A mineral fee owner has a "right to produce" subject to state law. A mineral leasehold owner has a "right to produce" subject to the terms of the lease and state law. The mineral leasehold owner's "right to produce" may be further circumscribed by voluntary or compulsory pooling. Although the fee or leasehold interest may be the origin of the "right to produce," such a "right to produce" is controlled, limited, or extended by contractual agreement and state authorities. Consequently, the mere fact that the Robert Leger Well No. 1 was drilled on a different lease from that on which the Lucky Strike Well No. 1 was drilled did not entitle Grigsby to classify the Robert Leger Well No. 1 production as "new oil" emanating from a different "right to produce."

## B. PRODUCTION OUTSIDE THE UNITIZED PREMISES OF THE HEYWOOD SAND, RESERVOIR A, SAND UNIT B?

Grigsby argues that the Robert Leger Well No. 1 production could not have been subject to the same "right to produce" as the Lucky Strike Well No. 1 production, because the orders of the Louisiana Commissioner of Conservation unitizing the Heywood Sand, Reservoir A, Sand Unit B, from which the Lucky Strike Well No. 1 produced did not and could not include within the unitized area the reservoir from which the Robert Leger Well No. 1 produced.

The premise of Grigsby's argument, that unitization is the source of the "right to produce" and, hence, the unitized premises defines the property, is correct where mineral fee or leasehold interests have been aggregated by unitization. The analysis set forth in subsection A, *supra,* supports the premise insofar as it recognizes that contractual agreements and state regulatory agencies modify the "right to produce" which inheres in fee or leasehold ownership. Ruling 1975–15, 40 Fed.Reg. 40832 (1975), expressly stated: "Generally, therefore, since the unit agreement signifies one right to produce crude oil arising from several

---

**k.** The FEA acknowledged that "property" is "generally synonymous with the tract or premises as to which a right to produce exists pursuant to an oil and gas lease." Ruling 1977–1, 42 Fed.Reg. 3628, 3632 (1977). However, the FEA has never stated that "property" is always defined by the lease.

leases or fee interests, the unit defines the property." [1]

Grigsby contends that the orders of the Louisiana Commissioner of Conservation unitizing the Heywood Sand, Reservoir A, did not and could not include the Upper Heywood "A" Sand, Reservoir A, from which the Robert Leger Well No. 1 produced. Order No. 464–F–1 issued February 20, 1969, created two drilling and production units to replace the single unit established by Order No. 464, issued May 5, 1959. Order No. 464–F–1, on its face, contemplated the drainage of the single reservoir heretofore defined in Order No. 464 as that sand bearing oil between the depth of 9477 and 9632 feet in the unit well.[m]

Under Louisiana law, the units established by Order No. 464–F–1 could have included only one reservoir. La.Rev.Stat. Ann. § 30:9(B) (1975) provides in pertinent part: "For the prevention of waste and to avoid the drilling of unnecessary wells, the commissioner shall establish a drilling unit or units for each pool." " 'Pool' means an underground reservoir containing a common accumulation of crude petroleum oil or natural gas or both." La.Rev.Stat.Ann. § 30:3(6) (1975). Unitization orders must be "upon terms and conditions . . . that will afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool." La.Rev.Stat.Ann. § 30:10(A)(1)(a) (1975).

*In hindsight,* therefore, Grigsby is correct: the Robert Leger Well No. 1 production was not from the same reservoir, hence unitized premises, as the Lucky Strike Well No. 1 production.

If the Robert Leger Well No. 1 production had been *officially* recognized *at the outset* as production from outside the Heywood Sand, Reservoir A, then the production would be from a "property" distinct from that of the Lucky Strike Well No. 1. The result would be controlled by Ruling 1977–1, 42 Fed.Reg. 3628, 3634 (1977):

It is not uncommon for less than the total premises subject to a right to produce to be unitized or otherwise aggregated with all or portions of premises subject to other rights to produce, to form a single "property," leaving the balance of the premises formerly subject to a single right to produce not aggregated with any such rights. The portion of the premises which is not aggregated is appropriately recognized as a property separate and apart from the portion of the premises which has been aggregated with other rights to produce.

In some cases, FEA understands that the inclusion of the so-called "Pugh" clause in a lease would operate to create a separate and distinct right to produce with respect to the non-unitized portion of the premises subject to that lease by stating that production from the unitized portion of a lease will not serve to fulfill the lessee's production obligations with respect to the non-unitized portion. Thus, the two portions of the lease including such a clause would become separate properties by the terms of the lease itself. However, even where such a clause is not included, FEA has concluded that treat-

---

1. "Determination of new, released and stripper well crude oil for units formed prior to the date on which unit BPCL regulations were adopted (February 1, 1976 for enhanced recovery units and September 1, 1976 for all units) are subject to the provisions of FEA Ruling 1975–15 as modified on February 1, 1976." Ruling 1977–2, 42 Fed.Reg. 4409, 4415 (1977). Under Ruling 1975–15, the BPCL, in the case of a pre-1972 unitization, is the total 1972 monthly production from the unit. In the case of a post-1972 unitization, the BPCL is the total 1972 monthly production from all of the leases that now comprise the unit. We intimate no view on the validity of the promulgation of Ruling 1975–15, since the issue was raised for the first time on appeal. *See Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

m. Order No. 464–F–1 might have been misinterpreted by the district court, because Order No. 464, to which reference is made, was not in the record below. Another possible source of confusion is that Order No. 464 defines the reservoir by the depths of a single well, whereas Order No. 464–F–1 established two unit wells. Notwithstanding its imprecise language, Order No. 464–F–1 created two drilling units for one reservoir and force-pooled the leasehold premises participating in each unit.

ment of the non-unitized portion of the premises as a separate property is appropriate.

Since Order No. 464–F–1 unitized only certain horizontal strata of the various leased premises, the non-unitized remainder of the various leased premises would be "property" separate from the unitized portion of the premises. This interpretation of the federal "property" regulation comports with the Louisiana law of lease cancellation: "production from a nonpooled, or non-unitized stratum is not to be viewed as the equivalent of production from pooled or unitized premises." *LeSage v. Union Producing Co.*, 176 So.2d 777, 783 (La.Ct.App. 1965), rev'd on other grounds, 249 La. 42, 184 So.2d 727 (1966); *accord Wilcox v. Shell Oil Co.*, 226 La. 417, 76 So.2d 416, 418 (1954).

■ It is beyond dispute that the Robert Leger Well No. 1 production was officially recognized as production beyond the Heywood Sand, Reservoir A, on June 24, 1976, when the Louisiana Commissioner of Conservation issued two orders recognizing two separate reservoirs in the North Jennings Field and unitizing the newly discovered reservoir.[n] The unitization of the Upper Heywood "A" Sand, Reservoir A, Sand Unit B, and the designation of the Robert Leger Well No. 1 as the unit well, in Order No. 464–K, gave rise to a new "right to produce" and, thus, a new "property," under Ruling 1975–15. Accordingly, we hold that Grigsby was authorized to charge "new oil" prices for the Robert Leger Well No. 1 production from the Upper Heywood RA SU B as of June 24, 1976.

The official status of the Robert Leger Well No. 1 production from October 14, 1974, until June 24, 1976, is not clearly established by the record or the briefs before us. The need for certainty and finality in the enforcement of price control regulations militate against the retroactive application of Order No. 464–K which defined the Upper Heywood "A" Sand, Reservoir A. For the same policy reasons, any erroneous treatment of the Robert Leger Well No. 1 production as production from the Heywood Sand, Reservoir A, will not be retroactively corrected.[o]

We remand the case to the district court for consideration of the official status of the Robert Leger Well No. 1 production from October 14, 1974, until June 24, 1976. On remand, Grigsby bears the burden of proving that the Robert Leger Well No. 1 production was not treated as production from the Heywood Sand, Reservoir A, for the period in question. The burden rests with Grigsby so that the DOE may, in enforcing price control regulations, rely upon the treatment of production as well as the official designations made by state regulatory agencies.[p] Order No. 464–F–2, issued July 26, 1974, denominated the Robert Leger Well No. 1 as the "substitute unit well" for the Heywood RA SU B after the Lucky Strike Well No. 1 began to produce salt water. The "substitute unit well" status apparently continued until the orders of June 24, 1976 were issued. Order No. 464–F–2 provided that "all pertinent provisions of the 464–F Series of Department of Con-

---

**n.** Order No. 464–F–3 recognized the presence of two reservoirs in the North Jennings Field, in language that was less than crystal clear. The order also continued in effect with some redefinition the two units and the corresponding unit wells for the Heywood Sand, Reservoir A, which had been established in Order No. 464–F–1.

**o.** It would have been reasonable to erroneously treat the Robert Leger Well No. 1 production as production from the Heywood RA SU B, given that the Upper Heywood "A" Sand, Reservoir A, was separated from the Heywood Sand, Reservoir A, by only 11 feet in the Robert Leger Well No. 1. The probability that the subsurface stratum was not completely horizontal

would increase the risk that the two reservoirs might be mistaken for one reservoir.

**p.** The circuitous argument that the Robert Leger Well No. 1 production was not treated as Heywood RA SU B production, because "new oil" prices were charged for the Robert Leger Well No. 1 production will, of course, be of no avail to Grigsby. "Treatment" refers to whether or not the production was allocated according to a pooling agreement or order. If the treatment of production by the parties in interest is inconsistent with state law, state law in tandem with federal policy will guide the FEA and its successor, the DOE. If a state agency's order is inconsistent with its prior practice or state law, federal policy alone will control.

servation orders and the units created thereby are continued in effect." Among the provisions of Order No. 464–F–1 was the following:

> The separately owned tracts, mineral leases and other property interests within the units established herein are hereby pooled, consolidated, and integrated in accordance with Section 10, Title 30 of Louisiana Revised Statutes of 1950, with each tract sharing in unit production in the proportion that the surface area of such tract bears to the entire surface area of said unit. Also, all operations on and production from such unit shall be considered operations on and production from each of the separate tracts within said units and under the terms of each of the mineral leases affecting said tracts.

If the production from the Robert Leger Well No. 1 were apportioned among the lessees who shared an interest in the Heywood RA SU B, in accordance with the above pooling order, then the production should have been classified as "old oil." [q]

The *amicus curiae* reply brief for the State of Louisiana on rehearing declares that "any production from the higher reservoir must be attributable to the [Leger] leasehold." The responsive brief for the DOE, on the other hand, alleges that Grigsby paid *"pro rata* shares [of the Robert Leger Well No. 1 production] to the [Heywood RA SU B] . . . parties in interest." Even if Grigsby proves that the Robert Leger Well No. 1 production was not subject to pooling between October 14, 1974, until June 24, 1976, he must reconcile such treatment with the "substitute unit well" designation in Order No. 464–F–2 to the satisfaction of the district court in order to prevail in his claim that the Robert Leger Well No. 1 production was "new oil" for the time period in question. The district court rendered summary judgment for the FEA with respect to the Robert Leger Well No. 1 production prematurely and upon clearly erroneous findings.

## SUMMARY JUDGMENT AND CONCLUSION

Grigsby argues that the district court erred in granting the FEA's motion for summary judgment, because there was a genuine dispute of material facts which would be determinative of the court's decision if resolved in favor of the FEA. *See Mobil Oil Corp. v. FEA,* 566 F.2d 87, 92 (Em.App.1977).

We affirm the district court's grant of FEA's motion for summary judgment with respect to the West Pontchartrain Field. The ceiling price for the oil produced from the West Pontchartrain Field should be set at the same price as that posted for oil in the Shell Good Hope Field for oil between 37° and 37.9° gravity, $3.94 per barrel.

We reverse the district court's grant of FEA's motion for summary judgment with respect to the North Jennings Field and remand for further proceedings consistent with this opinion. Upon remand, the sole issue before the district court will be whether the production from the Robert Leger Well No. 1 from October 14, 1974, until June 24, 1976, should be deemed production from the Heywood Sand, Reservoir A, Sand Unit B. Attention should be directed to the official designation of the Robert Leger Well No. 1 as a "substitute unit well" for the Heywood Sand, Reservoir A, Sand Unit B, and any pooling of the well's production.

*Affirmed in Part, Reversed and Remanded in Part.*

---

q. If a voluntary pooling agreement was in effect among the lessees who shared an interest in the Heywood RA SU B, between October 14, 1974, and June 24, 1976, Grigsby will bear the burden of proving that any apportionment of production among the lessees was pursuant to the voluntary pooling agreement rather than the compulsory pooling provision in Order No. 464–F–1.