MOUNTAIN FUEL SUPPLY CO., Plaintiff-Appellee,

v.

UNITED STATES DEPARTMENT OF ENERGY, Defendant-Appellant,

and

The United States of America, Counterclaimant-Appellant.

No. 10–23.

Temporary Emergency Court of Appeals.

Argued Nov. 12, 1980.

Decided May 11, 1981.

Rehearing and Rehearing En Banc Denied Aug. 7, 1981.

Jameson, J., filed dissenting opinion.

Barbara L. Ward, Washington, D. C. (argued), with whom on the brief were Alice Daniel, Asst. Atty. Gen., and Dennis G. Linder and C. Max Vassanelli, Attys., Dept. of Justice, Washington, D. C., and Paul Wallach and Peter Aron, Dept. of Energy, Washington, D. C., for defendants-appellants.

Michael J. Heyrend (argued), with whom on the brief were Robert S. Campbell, Jr., of Watkiss & Campbell, and R. G. Groussman, Salt Lake City, Utah, for plaintiff-appellee.

Before CHRISTENSEN, JAMESON, and DUNIWAY, Judges.

DUNIWAY, Judge.

The issue in this case is the proper interpretation of the term "posted price" as used in the Department of Energy's mandatory pricing regulations, 10 C.F.R. §§ 212.31 and 212.73. The district court accepted Mountain Fuel's interpretation and set aside the Department's finding that Mountain Fuel had violated the price controls in its sales of crude oil produced at the Dry Piney Field. We reverse.

## I. THE FACTS AND REGULATORY SCHEME

Mountain Fuel is the sole operator and part owner of the Dry Piney Field in southwest Wyoming. The field was developed by Mountain Fuel and two other companies as working partners. Under the operating agreement, Mountain Fuel retains a 50 percent interest in the field with the balance divided between the others. The United States Geological Survey (USGS) has a 12.5 percent royalty interest.

In 1970 crude oil production began at the Nugget Formation at the field, producing the oil at issue in this litigation. Nugget crude is of high quality because of low sulphur content and high gravity—averaging between 55 and 65 degrees—and requires a minimum of refining. In the period from 1970, when production began, to 1973, when price controls were instituted, the bulk of this crude was purchased by six companies—Cowboy Oil Company, Caribou-Four Corners Oil Company, Western Crude Oil Company, Johnson Oil Company, Husky Oil Company, and Delgado Oil Company—

most of whom lack substantial refining facilities and therefore were attracted to the high quality of Nugget crude. This special demand for Nugget crude was reflected in the price paid for it by these buyers during the period 1970–73.

AMOCO Oil Co. circulates a crude oil bulletin stating the prices at which it will purchase crude oil depending on the locality, grade and gravity of the oil. Throughout the period 1970–73, the AMOCO bulletin stated a price for southwestern Wyoming, and for crude oil of a gravity of 40 degrees or above, thus covering the Dry Piney Nugget crude. AMOCO never actually purchased any of the Nugget crude, however, and the bulletin price was used primarily only as a base price for sales at the field. Thus, during the period 1970–73 the majority of contracts between sellers and buyers at the field specified a price of the AMOCO bulletin price plus an additional 3¢ per barrel or "AMOCO plus 3¢."

Although AMOCO plus 3¢ was the typical price during the period, in April 1973, Mountain Fuel received an oral offer from Cowboy Oil Co. to purchase all available Nugget crude at AMOCO plus 47¢. Cowboy offered such a high price because of its supply arrangement with Allied Chemical Company and the discovery that Nugget crude could be used by Allied as burner fuel without any refining. As required by the operating agreement, Mountain Fuel passed along the terms of Cowboy's offer, in an oral communication, to its working partners.

On April 24, 1973, Mountain Fuel and one of its partners, Belco, entered into a written contract with Cowboy for the sale of 600 barrels a day of Nugget crude at a price of AMOCO plus 47¢. Because of other commitments, Exxon, the other partner, was unable at that time to sell any of its oil to Cowboy, and the remaining production from the field of Nugget crude—some 2,400 barrels per day—was sold at a far lower price, generally AMOCO plus 3¢.

In August, 1973, soon after the Cowboy contract was negotiated, price controls on domestic crude oil were put into effect.

The ceiling price for "old" crude oil, such as is produced at the Dry Piney Field, is defined under the regulations as:

the sum of: (1) The highest posted price at 6 a. m., local time, May 15, 1973, for transactions in that grade of crude oil in that field, or if there was no posted price in that field for that grade of domestic crude oil, the related price for that grade of domestic crude oil which is most similar in kind and quality in the nearest field for which prices were posted; plus (2) $1.35 per barrel. 10 C.F.R. § 212.73(b), first promulgated by the Cost of Living Council at 38 Fed.Reg. 22,538 (August 22, 1973).

"Posted price," in turn, is defined by the regulations as "a written statement of crude oil prices circulated publicly among sellers and buyers of crude oil in a particular field in accordance with historic practices, and generally known by sellers and buyers within the field." 10 C.R.R. § 212.31. This definition was originally promulgated by the Cost of Living Council (CLC), 38 Fed.Reg. 33,578 (December 6, 1973). In the preamble to the regulations defining the term, the CLC explained that "a posted price must be a publicly circulated written offer to purchase. It does not include premiums above posted prices which may have been paid for crude purchased on May 15, 1973." 38 Fed.Reg. 33,578 (December 6, 1973).

The final agency gloss on the term "posted price" came later in Ruling 1977–1, 42 Fed.Reg. 3628, 3635 (January 19, 1977), in which the Federal Energy Administration (FEA) attempted to further clarify the posted price definition:

While the CLC definition did not require the formality of a printed price bulletin such as is published by major purchasers, the CLC did require the formality of a "publicly circulated written offer." The requirement that the offer be in writing eliminates verbal offers, and the requirement that the written offer be publicly circulated eliminates offers (even though written) to specified producers. Accordingly, other than the

published price bulletins of the type traditionally issued by major oil companies, FEA will only recognize as a "posted price" written offers to purchase only so long as they were bona fide public offers of general applicability to crude oil producers in the field. For example, a letter from a purchaser to all crude oil producers in a field or in an area would constitute a posted price if the letter was understood by producers and the purchaser to be a bona fide offer to purchase from all producers in that field or area. A written contract, of course, would not qualify as a posted price because it represents an agreement between a buyer and specific producer, not a bona fide offer to purchase from all producers. 42 Fed.Reg. 3,635 (January 19, 1977).

Simply stated, the dispute in this litigation is whether the Cowboy price was a "posted price," and thus the "highest posted price" for purposes of determining the ceiling price for Dry Piney crude, or whether the only posted price at the field was the AMOCO bulletin price. Following institution of price controls and through 1974, Mountain Fuel, Belco, Exxon and USGS used the Cowboy contract price, AMOCO plus 47¢, as the basis for figuring the ceiling price for Dry Piney Nugget crude. The FEA challenged this determination of the ceiling price and issued a Remedial Order to Mountain Fuel, finding that the AMOCO bulletin price was the highest posted price and ordering Mountain Fuel, as the sole operator and part owner of the field, to refund approximately $450,000 in overcharges, plus interest, to the customers of the field. This decision was affirmed by the Office of Hearing and Appeals and Mountain Fuel sought judicial relief.

Before the district court Mountain Fuel argued in relevant part: (1) that C.F.R. § 212.31 defining posted price is invalid; (2) that if valid, 10 C.F.R. § 212.31, as well as Ruling 1977–1, are but interpretive regulations not entitled to judicial deference in the circumstances here; (3) that even if the agency's posted price definition is valid and controlling, the Cowboy contract falls within this definition; and (4) that even if the Cowboy contract was not the posted price, Mountain Fuel cannot be held liable alone for all of the overcharges from the field.

The district court upheld the validity of the posted price definition, but found that the Cowboy contract, AMOCO plus 47¢, was a posted price. The court held that it might substitute its judgment for that of the agency because the posted price definition in 10 C.F.R. § 212.31, Ruling 1977–1, and the agency's Decision and Order in this case were all merely interpretive regulations or rulings and therefore not binding on the court in the circumstances here. The court accordingly vacated the agency's order to Mountain Fuel to refund the overcharges, and did not reach Mountain Fuel's last argument as to liability.

## II. THE MERITS

The sole issue before us now is whether the agency properly interpreted its regulations in finding that the Cowboy contract price was not a posted price and whether that interpretation and those regulations are entitled to a measure of deference from this court.

The agency concluded that the Cowboy contract lacked the essential characteristics of a posted price. First, although Mountain Fuel orally transmitted the terms of the contract to its fellow producers, the definition calls for public circulation of "a *written* statement of crude oil prices." Since the Cowboy contract—the "written statement" —was not itself circulated among producers at the field, the agency found that this portion of the definition was not satisfied.

Moreover, the Cowboy contract was just that—a contract for the purchase of 600 barrels per day—and not a public *offer* to purchase. Although the definition refers only to a "written statement," the agency interprets the term to require a "written *offer*," relying on the CLC's preamble to the definition—"It provides that a posted price must be a publicly circulated written *offer* to purchase," *supra*, (emphasis added) —and Ruling 1977–1, *supra*, in which the FEA stated that "A written contract, of

course, would not qualify as a posted price because it represents an agreement between a buyer and specified producer, not a bona fide offer to purchase from all producers."

If the agency's interpretation of the necessary attributes of a posted price is correct, then certainly its conclusion that the Cowboy contract was not a posted price is supported by substantial evidence. Quite simply, there was no publicly circulated written offer to purchase crude at the field aside from the AMOCO bulletin. Rather, Mountain Fuel urges that we should adopt a different and more liberal interpretation of the "posted price" definition. It argues that the requirements of the term as stated in 10 C.F.R. § 212.31 were essentially met by the Cowboy contract—the price was embodied in a writing, the price was publicly circulated "in accordance with historical practices," the price was generally known among buyers and sellers, the contract was understood by all concerned to be an offer to purchase from all producers at the field, and finally, Cowboy had made it clear that it wished to purchase all available Nugget crude and not just the 600 barrels per day specified in the contract. It argues, in short, that under any reasonable interpretation of the posted price term, the Cowboy contract, in the circumstances here, was such a price and that we are free to ignore the agency's overly strict interpretation in Ruling 1977–1 and in this very case. We disagree.

■ The agency explained to Mountain Fuel at a hearing on its administrative appeal that the posted price was not intended as a precise estimate of the market price at a field:

The practices you have described are classic practices of the industry. . . . Offers are made orally. . . . There is a bonus price paid for the crude oil. . . . But I don't think you understand the function of the definition. . . . The FEA, or the DOE, are certainly trying to promulgate a rule for various purposes, and they did not have to pick up the sale price of crude oil in the field. In fact, they did not pick

up the sale price as a reference price to the crude oil. They picked up another price, one that they felt was better, or would better meet the needs of the agency and the statute. That was not the price being paid. Record at 726–27.

In *Grigsby v. DOE*, Em.App. 1978, 585 F.2d 1069, 1079, we found that Ruling 1977–1 and the agency's position stated in the ruling that a written contract is not a posted price, "easily meets a threshold standard of rationality":

It furthers the DOE policy to maintain the general availability of posted prices by permitting both producers and purchasers to determine applicable ceiling prices for a given grade of oil produced from a particular field. Because posted prices are a matter of public record, and thus generally available, they help produce the desired uniformity for purposes of maintaining equitable prices pursuant to § 4(b)(1)(F) of the Emergency Petroleum Allocation Act. The requirement that posted price be *bona fide* offers to all [producers serves] another purpose also. The use of such prices eliminates the inherent inequities of contractual prices which normally involve numerous other bargaining factors.

We now repeat our holding in *Grigsby* that the agency's interpretation of the posted price term is reasonable and supported by valid policy considerations. Certainly, the agency's view that the term requires a publicly circulated written offer to purchase is not "plainly erroneous or inconsistent with the regulations." *Udall v. Tallman*, 1964, 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 quoting *Bowles v. Seminole Rock Co.*, 1945, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700.

■ Nor can we agree with Mountain Fuel or the district court that the normal rule of deference to an agency's construction of its own regulations, *see Udall v. Tallman, supra*, 380 U.S. at 16, 85 S.Ct. at 801, should be abandoned in this case. This is an area where administrative expertise is relevant; we deal here not with "general common law principles," *Jicarilla Apache*

*Tribe v. Federal Energy Regulatory Commission*, 10 Cir., 1978, 578 F.2d 289, 292–93, but with a technical term of art and industry usage. Moreover, while the posted price term has been clarified by the agency in successive regulations, these clarifications have not been inconsistent with one another. *Standard Oil Co. v. DOE*, Em.App., 1978, 596 F.2d 1029, abandoned the rule of deference only in an instance in which the agency's interpretation of its regulation followed a history of confusion and contradiction. There is no comparable history here, nor do we detect the taint of retroactivity.

We therefore uphold the agency's interpretation of the term posted price, and its finding that the Cowboy contract was not a posted price. Because the district court did not reach Mountain Fuel's argument that it cannot be held liable alone for all of the overcharges, we do not reach it either. That question is for the district court, in the first instance.

Reversed and remanded for further proceedings consistent with this opinion.

JAMESON, Judge, dissenting.

I respectfully dissent. While a close question is presented, I would hold that the district court did not abuse its discretion in setting aside the remedial order issued by the DOE.

As the district court noted, a unique factual situation is presented: a small isolated oil field with an exceptionally high quality product, with only three producers and six purchasers, most of them operators of small refineries, and comprising a market distinct from the larger oil companies. The purchasers customarily made oral offers to Mountain Fuel, which in turn passed the offers on to its two operating partners, Belco and Exxon.[1]

The same practice was followed with regard to Cowboy Oil Company's offer in April, 1973 to purchase all Dry Piney Nugget crude that could be allocated to it at "Amoco, plus 47¢." Mountain Fuel communicated the offer to Belco and Exxon. Belco agreed to its terms. Exxon did not at that time participate in the sale due to prior commitments. Acting for itself and as agent for Belco, Mountain Fuel then entered into the contract to purchase a specified amount of crude oil.[2] Copies of the contract were sent to the other producers.

In August of 1973 the Cost of Living Council (CLC) promulgated the regulations tying the price of lower tier oil to the "highest posted price" on May 15, 1973. The term "posted price" was not defined in the regulation. In September, 1973, the CLC circulated CLC Form 90, a monthly compliance form, which defined posted price as:

A public offer to buy a specific grade of petroleum in a specific geographical area at specified price.... The term is inclusive of any other term which may be used in a manner which coincides with the above definition.

Shortly after CLC Form 90 was issued, Mountain Fuel's legal department rendered an opinion that the Cowboy offer fell within the definition of posted price, because it was made and circulated to all the producers in the field, the relevant "public."

It was not until December, 1973, that the agency promulgated the definition requiring a publicly circulated writing.[3] As the district court stated, the agency's interpre-

---

1. As the district court stated, "These buyers generally used the Amoco bulletin only as a base reflecting market fluctuations of a national and foreign character and upon which additional sums per barrel were added." Premium prices were uniformly paid, most purchases having been made at Amoco, plus 3 cents a barrel.

2. In October of 1973 Mountain Fuel was instructed by Exxon to allocate its proportionate interest to the Cowboy contract. In November of 1973 the United States Geological Survey notified Mountain Fuel that it had elected to take its royalty interest in kind as "royalty oil," and instructed Mountain Fuel to sell the oil to Sage Creek and Mountaineer Refiners at Amoco plus 47¢, i. e., the Cowboy contract price.

3. The "written statement" was to be circulated publicly "among buyers and sellers in a particular field in accordance with historic practices and generally known by sellers and buyers within the field."

tation of posted price was in the developing stages during the relevant period; thus it was not of longstanding public knowledge. *Cf. Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 801–802, 13 L.Ed.2d 616 (1965). The agency acknowledged that considerable confusion surrounded the posted price concept as late as January, 1977, when the FEA issued Ruling 1977–1. The district court expressly noted that

> The agency interpretations defining "posted price" issued in CLC Form 90, 10 C.F.R. § 212.31, and in Ruling 1977–1 became progressively more restrictive, injecting a manifest burden of retroactivity upon those regulated, with the very real prospect of economic loss through after-the-fact application of the regulations, plus the risk of litigation, with its costs and penalties.

In May of 1977 Mountain Fuel received a Notice of Probable Violation, charging pricing violation for the period of September 1, 1973 through December 31, 1974.[4]

While an agency's interpretation of its regulations is normally deemed controlling, as this court recognized in *Standard Oil Co. v. DOE,* 596 F.2d 1029, 1056 (1978), this is not a "hard and fast rule." "The weight to be given to an administrative interpretation depends upon the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control'. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [65 S.Ct. 161, 164, 89 L.Ed. 124]...."[5] An agency interpretation is "less potent than it otherwise would be where it does not rest upon matters peculiarly with the [agency's] field of expertise," *Southern Mutual Help Association, Inc. v. Califano,* 574 F.2d 518, 526 (D.C.Cir.1977).

I think the district court could properly conclude that the definition of posted price is not peculiarly within the DOE's field of expertise. Both parties refer to a general text on oil and gas law for a definition of posted price. The definition is indefinite, indicating that the meaning of the term depends in part on its application to the practices of a particular oil field. In other words, the definition has varied with time and place.

The district court followed the guidelines set out in *Standard Oil, supra,* 596 F.2d at 1063–64, in "balancing the degree of burden it would impose on a party against the statutory interest to be served by retroactive application." The court found that Mountain Fuel "made good-faith efforts to ascertain the meaning and comply with the regulations as they were promulgated." The court also considered the specific objectives of the Emergency Petroleum Act, 15 U.S.C. § 753(b)(1), and concluded that recognizing the Cowboy price as the highest posted price in the Dry Piney field better served the EPAA objectives.

To uphold the Cowboy price as the highest posted price in the Dry Piney field would not require this court to abrogate its holding in *Grigsby v. DOE,* 585 F.2d 1069 (Em.App.1978); nor would it invalidate the posted price definition in general. *Grigsby* is distinguishable. In that case the parties stipulated that there was no posted price in the field in question, and the producers were attempting to establish a contract price as a related price for a nearby field even though a posted bulletin existed in that field for the particular quality of oil in question. As this court noted in *Grigsby,* under FEA Ruling 1977–1, "a written contract will not qualify as a posted price 'because it represents an agreement between a buyer and specific producer, not a bona fide

---

4. Commencing in the Fall of 1974 and ending in the Spring of 1975, DOE auditors reviewed the books of Mountain Fuel. They advised counsel for Mountain Fuel of a possible violation of CLC regulations relative to price ceilings on old oil, that a review would be made of the results of the audit, and that Mountain Fuel would be advised as soon as possible of their recommendations.

5. In concluding that the "court may and should substitute its judgment" in the interpretation of "highest posted price" under the peculiar facts of this case, the district court relied upon this court's decision in *Standard Oil v. DOE* and *Energy Reserves Group, Inc. v. DOE,* 589 F.2d 1082, 1093 (TECA 1978).

offer to purchase from all producers'." *Id.* at 1079. Here there was a bona fide offer to purchase from all producers. The oral offer, made to Mountain Fuel, was promptly communicated to *all* of the other producers, and copies of the contract based on that offer were likewise sent to all of the other producers. This was in accordance with the "historic practices" in the Dry Piney field. There was no regulation requiring a written statement publicly circulated when the Cowboy contract was made.

The district court found that "the Cowboy contract price was in substantial, if not complete, compliance with the pertinent regulations...." The court found further that the objectives of the EPAA "would be better served ... by recognizing the Cowboy contract price as the posted price," and that "it is more 'equitable' to allow the Cowboy contract price which reflects the value of the oil more accurately than the Amoco bulletin, especially since that price was determined by a good faith setting of the posted price according to a good faith application of the pertinent regulations in force at the time of the determination."

I would affirm.