DEPARTMENT OF ENERGY,
Defendant-Appellant,

v.

W.B. OSBORN, Plaintiff-Appellee.

No. 10–50.

Temporary Emergency Court of Appeals.

Argued Dec. 6, 1983.
Decided March 28, 1984.

Linda M. Samuel, Washington, D.C., with whom Catherine C. Cook and Thomas H. Kemp, Dept. of Energy, Office of Gen. Counsel, Washington, D.C., were on the briefs, for defendant-appellant.

Fred A. Gipson, Seminole, Okl., with whom Steed, Gipson, Johnston & McMains, Seminole, Okl., and Jack Speight, Hathaway, Speight & Kuntz, Cheyenne, Wyo., were on the brief for plaintiff-appellee.

Before JAMESON, CRAIG and McNICHOLS, Judges.

JAMESON, Judge.

The Department of Energy (DOE) has appealed from a district court judgment holding a Remedial Order issued to W.B. Osborn invalid. Finding that the Remedial Order was within the agency's authority and based on findings supported by substantial evidence, 12 U.S.C. § 1904 note at § 211(d)(1), we reverse.

I. FACTS AND PROCEEDINGS BELOW

W.B. Osborn is an independent oil and gas producer who owns and operates oil producing property in Wyoming and elsewhere. In 1976 the Economic Regulatory Administration (ERA) conducted an audit of Osborn's oil production from September 1973 through January 1976. The ERA issued a Notice of Probable Violation on September 2, 1977, followed by a Proposed Remedial Order on August 25, 1978. In the Proposed Remedial Order, the ERA alleged that Osborn had sold crude oil from

its Wyoming property at prices exceeding the applicable ceiling price levels, resulting in overcharges to Osborn's customers of $174,141.61 plus interest.

The ERA calculated the applicable "ceiling prices" based on "the highest posted price" on May 15, 1973 for oil in the fields where Osborn's property is located. 10 C.F.R. § 212.73(b). The ERA determined the highest posted prices of $3.83 and $3.76 per barrel from an Amoco price bulletin dated April 1, 1973. In response to the Notice of Probable Violation and in his statement of objections to the Proposed Remedial Order, Osborn contended that the highest posted price was offered by Inexco Oil Co., not Amoco. According to Osborn, Inexco offered to purchase oil in the Powder River Basin in Wyoming, where Osborn's property is situated, for $3.96 a barrel. The ERA concluded, however, that the Inexco offer did not meet the regulatory requirements for a posted price. See 10 C.F.R. § 212.31. The Office of Hearings and Appeals similarly rejected Osborn's contentions and issued the final Department of Energy Remedial Order requiring Osborn to refund the overcharges and comply with the pricing regulations. Osborn then filed a complaint in the United States District Court for the District of Wyoming on December 7, 1981, seeking *inter alia* an order setting aside the Remedial Order.

On Cross motions for summary judgment the district court issued findings of fact and conclusions of law, the most pertinent of which are the following: (1) Osborn offered "substantial, uncontroverted evidence" to establish that the Inexco offer was the highest posted price applicable to his property; (2) Inexco's price "was generally known among producers and purchasers in the Powder River Basin, and was considered by them to be a bona fide public offer"; (3) the DOE was "deemed to have waived" the argument that the Inexco offer did not extend to Osborn's fields; (4)

"the administrative record does not contain substantial evidence to support the findings and conclusions of [DOE] that the Inexco price was not a valid posted price." Based primarily on the foregoing findings and conclusions, the court ruled that the DOE's Remedial Order was "invalid and void" and that the DOE was "permanently enjoined and restrained from enforcing said remedial order." The DOE appealed from this judgment.

## II. STANDARD OF REVIEW

Section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. § 754(a)(1), incorporates by reference the judicial review provisions of the Economic Stabilization Act (ESA), 12 U.S.C. § 1904 note at § 211(d)(1). See *Seneca Oil Co. v. DOE*, 712 F.2d 1384, 1395 (TECA 1983). Under these provisions of the ESA, "no order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority, or is based upon findings which are not supported by substantial evidence." 12 U.S.C. § 1904 note at § 211(d)(1); see *Rossi v. Mobil Oil Corp.*, 710 F.2d 821, 830 (TECA 1983). Our sole inquiry, therefore, is whether the Remedial Order exceeded the DOE's authority or is based on findings not supported by substantial evidence.[1] As a general rule, we are restricted in our inquiry to the record compiled by the agency. *FPC v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1975); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Substantial evidence is such relevant evidence "as a reasonable mind would accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).

---

1. Under 12 U.S.C. § 1904 note at § 211(d)(1), we review the agency's order by the same standard that the district court should apply. In cases where both courts are restricted to reviewing the agency record by the same standard of review, the district court's decision is entitled to no particular deference from the court of appeals. See, *e.g., Committee for Independent P–I v. Hearst Corp.*, 704 F.2d 467, 471–72 (9th Cir. 1983).

## III. POSTED PRICE

### A. *The Agency's Interpretation*

The DOE relied on two agency interpretations of the term "posted price". First, in 1973 the Cost of Living Council (CLC) proposed a definition of "posted price" which appears substantially unchanged at 10 C.F.R. § 212.31 (1981):

> "Posted Price" means a written statement of crude petroleum prices circulated publicly among sellers and buyers in a particular field in accordance with historical practices, and generally known by sellers and buyers within that field.

38 Fed.Reg. 33,578 (1973). In the preamble to this definition, the CLC additionally explained that a posted price could take the form of "a publicly circulated written offer to purchase." *Id.*

Second, in 1977 the Federal Energy Administration issued an interpretive ruling to resolve the confusion over the posted price definition. In the ruling the agency stated that its preferred sources for posted prices in the field were the price bulletins circulated by "principal purchasers ... announcing the price that that particular purchaser would pay for a particular grade crude oil in a particular location." Ruling 1977–1, 42 Reg. 3628 (1977) (codified at 10 C.F.R. 375, 390 (1980)). The agency stated, however, that the definition of posted price "did not require the formality of a printed price bulletin such as is published by major purchasers," but it did require "a publicly circulated written offer to purchase." *Id.* The agency further restricted such offers to "bona fide public offers of general applicability to crude oil producers in the field." *Id.* This restriction excluded both "verbal offers" and written offers to or contracts with "specified producers." *Id.*

The agency selected the posted price concept to implement uniform price controls so that producers and purchasers would be able to determine for themselves the ceiling price for any grade of crude oil produced from a particular field. *Id.* The effectiveness of this policy, of course, depended on a readily available, standard mechanism for establishing posted prices. Price bulle-

tins were particularly well-suited for this purpose because they were printed, publicly circulated, and applied to broad geographic areas. See *Grigsby v. DOE*, 585 F.2d 1069, 1079 (TECA 1978). To avoid at least the appearance of inflexibility, however, the agency decided to permit purchasers and producers to establish posted prices through "publicly circulated written offers to purchase." Nonetheless, such offers must have all the essential attributes of the price bulletins: they must be written; they must be publicly circulated; and they must extend generally to all producers in a given field or area. *Id.*

### B. *Cases Construing Posted Price Regulations*

This court has considered posted price issues in two cases, *Mountain Fuel Supply Co. v. DOE*, 656 F.2d 690 (TECA 1981) and *Grigsby v. DOE*, 585 F.2d 1069 (TECA 1978). Both *Grigsby* and *Mountain Fuel Supply* involved attempts by producers to establish posted prices from specific sales contracts. In both cases we said "the agency's interpretation of the posted price term is reasonable and supported by valid policy considerations." *Mountain Fuel Supply Co.*, 656 F.2d at 694; *Grigsby*, 585 F.2d at 1079. Although not directly controlling in this case, these two prior decisions leave no doubt (1) that the agency's interpretation of its own regulation is valid; and (2) that in the absence of a price bulletin, a publicly circulated, generally applicable written offer to purchase is necessary to establish a posted price.

## IV. THE INEXCO OFFER

The principal issue in this case is whether substantial evidence supports the agency's finding that the Inexco offer was not "a general written offer by Inexco to purchase crude oil produced from the relevant fields at $3.96 per barrel." We find substantial evidence in the administrative record to support this finding.

To establish the Inexco offer as a posted price, Osborn relied chiefly on a letter (the

Berner Letter) and attached exhibits [2] from Inexco's vice-president, A.S. Berner, to the Federal Energy Administration's regional manager in Texas. The letter was intended to supply the agency with "supplemental information regarding prices and postings in the Powder River Basin, Wyoming." The exhibits consisted of letters of agreement, division orders (executed by producers and royalty owners), and contracts. The information provided in the letter and exhibits was explicitly restricted to oil marketing activities in eight fields in the Powder River Basin: Carter, Frog Creek, Sherwin, Poison Draw, Fenton, Kaye, House Creek, and Hilight. The letter also pointed out that Inexco's offer to purchase crude oil at $3.96 per barrel applied to only five of the eight fields.

It is difficult to determine the extent to which the exhibits confirm the assertions in the letter. Only three exhibits mention the $3.96 offer: an Inexco letter dated May 2, 1973 to Perry Bass notifying him that Inexco was paying $3.96 at the Poison Draw Field effective April 19, 1973; a letter from Inexco to Yates Petroleum Corp. stating that Inexco "is now paying $3.96 per barrel for crude oil at the lease in the Poison Draw Field"; an Inexco partnership newsletter "for the information of its limited partners" stating that "drilling in the Poison Draw Field of Converse County Wyoming, is continuing" and that the "[c]urrent well-head price for the oil is $3.96 per barrel."

While we need not decide whether the exhibits establish a posted price for the Poison Draw Field, it is clear that they do not constitute a "publicly circulated written offer ... of general applicability to crude oil producers" in fields outside of the Poison Draw Field. In fact, Osborn has failed to point out a single document or combination of documents among the exhibits that could constitute a publicly circulated written offer to purchase oil.[3] The Yates and Bass offers and the divisional orders are at best evidence of prices offered to specific producers. We have already made it plain, however, that contracts with or offers to specific producers will not satisfy the regulatory requirements for posted prices. *Mountain Fuel Supply Co.*, 656 F.2d at 694; *Grigsby*, 585 F.2d at 1079.

In sum, the administrative record supports the agency's finding that there was no "general written offer" from Inexco. While this conclusion is sufficient to end our inquiry, we note further that if such an offer existed, the record supports

---

**2.** While the Berner letter was part of the formal administrative record in this case, the exhibits were not. The exhibits were included in the record of the DOE's separate but factually related investigation of Inexco and had been in the agency's possession since 1976. Osborn moved the district court to enlarge the record by admitting the exhibits into evidence. The court granted the motion over the DOE's objection, and the DOE now claims this was error. We disagree.

The letter is 40 pages long. It summarizes and interprets at length the attached exhibits. In effect, the letter incorporates the exhibits by reference, and the exhibits confirm the details and conclusions set out in the letter. Under analogous circumstances, we upheld admission of an affidavit offered by the agency in *Plumbers Local No. 519 v. Construction Industry Stabilization Committee*, 479 F.2d 1052, 1055–56 (TECA 1973). There we observed that the affidavit was "merely expository" of the agency's implicit findings. Similarly, the exhibits offered by Osborn in this case were merely expository of the Berner letter.

**3.** The district court found that Inexco had, "through division orders, letters, and various other oral and written means, offered to purchase crude oil" according to "a specified pricing formula." That pricing formula, the district court found, resulted in a price of $3.96 per barrel for a period of time and was considered by other purchasers to be a bona fide offer.

We disagree with this view of the evidence. The exhibits referred to by the district court at best are evidence of the contract price for oil in specific transactions. We have noted that "the posted price was not intended as a precise estimate of the market price...." *Mountain Fuel Supply*, 656 F.2d at 694. Without more, it is not possible to construe letters to and division orders from a specific, limited group of producers as a publicly circulated, generally applicable offer to purchase. The Berner letter, moreover, makes it clear that Inexco's offer was not intended to extend beyond a limited group of producers.

the agency's finding that it did not extend to Osborn's property.[4]

The Berner letter and an attached affidavit from an Inexco vice-president expressly restrict the scope of Inexco's purported offer: "Such offer was applicable to the following fields in the Powder River Basin, Wyoming: Frog Creek, Poison Draw, House Creek, Hilight, and Kaye." Inexco consistently alleged that its offer extended only to fields "in which Inexco was active" and only when such fields were "at that time connected to pipeline facilities." The regulatory effect of a restrictive offer is clearly explained in Ruling 1977–1. In its interpretive ruling, the agency posed a hypothetical circumstance where a general price bulletin covered a large geographic area and a competing bulletin offered a higher price but was "specifically limited to certain named fields." The agency ruled that "the existence of a price bulletin stating a higher price for specifically named fields within the same area will, of course, supersede the area-wide price bulletin, *for the named field only.*" Ruling 1977–1, 10 C.F.R. at 390–91 (1980) (emphasis added).

Given the restrictive nature of Inexco's offer, Osborn obviously had to show that his properties were located in the fields named by Inexco. Osborn neither alleged nor proved this critical point. The record indicates that Osborn's properties are situated in the Powder River Basin in Wyoming and are apparently connected to the Belle Fourche Pipeline facilities. Nonetheless, the properties are not located in the fields named by Inexco and thus are not covered by Inexco's purported offer.[5]

Finally, we note that on October 28, 1983, the DOE issued a final Remedial Order to Inexco, citing overcharges for crude oil produced in the Powder River Basin, Wyoming. Inexco attempted to rely on much of the same information offered by Osborn to establish a posted price of $3.96. It also cited the district court's decision in *Osborn v. DOE* to support its contentions. The agency, however, found the district court's decision "contrary to established precedent" of this court and "unpersuasive" (citing *Mountain Fuel Supply* and *Grigsby*). The agency reiterated as well that posted prices may not be based on "oral statements" and that "historic practices" are relevant to the posted price determination only "to the extent that they are bona fide, public written offers to purchase crude oil."[6]

## V. CONCLUSION

We are satisfied that substantial evidence supports the Department of Energy's interpretation of its posted price regulations. Accordingly, we uphold the Remedial Order issued to W.B. Osborn and reverse the judgment of the district court.[7]

REVERSED.

4. The district court found the DOE to have "conceded that the Inexco price would apply to the plaintiff's properties should it be found to be a 'posted price.'" Neither Osborn nor the district court, however, pointed to evidence of such a concession, implied or expressed. No such concession appears on the record. The DOE specifically found that Inexco did not make "a general written offer ... to purchase crude oil *produced from the relevant fields.*" (emphasis added). This is plainly a finding that any offer by Inexco did not extend to the fields in which Osborn's properties were located.

5. There was some confusion over the exact location of Osborn's properties, and Osborn has done nothing to resolve it. The agency tally sheets list the fields that include Osborn's properties as Breene, East Rozet, Little Mitchell Creek, and Windmill, all located in Campbell County, Wyoming. Osborn contended before the district court that these are names of proper-

ties or leases, not fields. Osborn, however, made no attempt to name the proper fields and did not effectively contest the agency's assertion that his properties were not located in the fields named by Inexco.

6. While the specific issues of the Inexco case are not before us, the agency's determination is relevant to our inquiry here because it demonstrates a consistent and reasonable agency approach to the evidence and contentions presented in this case.

7. The DOE also contends that venue was improper in the District of Wyoming. Under 28 U.S.C. § 1391(e)(2) and (3), venue was proper if the "cause of action arose" in Wyoming or "any real property involved in the action is situated" in Wyoming. The DOE argues that venue was improper under both tests.

The members of the panel are not in complete accord with respect to the venue issue. In any

event, it could not be resolved on the present record. We have concluded that a remand for further proof would delay unduly the final disposition of the case and accordingly have decided the case on the merits.